904 So.2d 896 (2005)
STATE of Louisiana
v.
Elton L. THOMAS, Jr.
Nos. 04-KA-1341, 04-KA-1342.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*898 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Desirée M. Valenti, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee, The State of Louisiana.
Holli Herrle-Castillo, Marrero, Louisiana, for Defendant/Appellant, Elton L. Thomas, Jr.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and CLARENCE E. McMANUS.
SUSAN M. CHEHARDY, Judge.
Elton L. Thomas appeals his convictions of armed robbery and aggravated battery, as well as his life sentence pursuant to a three-felony habitual offender adjudication. *899 We affirm, but remand for correction of a patent error.
This appeal involves two consolidated cases. In one of the cases, the Jefferson Parish District Attorney filed a bill of information charging Elton L. Thomas, Jr., the defendant herein, and Mary Uloho with armed robbery, in violation of La.R.S. 14:64. In a separate bill of information, Elton Thomas and Mary Thomas both were charged with aggravated battery. At arraignment Elton Thomas pleaded not guilty to both charges.
On June 27, 2001, after a hearing, the trial court denied the defendant's motions to suppress the evidence, identification and search warrant.[1] The defendant proceeded to trial before a jury on both charges, but the trial court declared a mistrial on March 27, 2002 because the State amended the armed robbery charge against Uloho to accessory after the fact.[2]
Another jury was selected on April 2, 2002 and the defendant proceeded to trial on both charges. The jury found the defendant guilty as charged the following day.[3] On May 16, 2002, the defendant appeared before the trial judge for sentencing. The defendant was sentenced to eighty years of imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for the armed robbery conviction and to ten years of imprisonment at hard labor for the aggravated battery conviction, to be served concurrently with the armed robbery sentence. The defendant orally moved for an appeal, which the trial court granted.
That same day, the State filed a habitual offender bill of information, which alleged the defendant is a third-felony offender based on the underlying armed robbery conviction and two other convictions. The defendant denied the allegations. After a multiple-bill hearing on July 25, 2002, the trial judge found the defendant to be a third felony offender.[4]
On January 13, 2003, the original sentence was vacated and the defendant was sentenced under La.R.S. 15:529.1 to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Thereafter, the defendant moved for an oral appeal. After a convoluted series of events, this consolidated appeal is now before this Court.[5]

*900 FACTS

At approximately 11:30 a.m. on March 3, 2001, Terry Bean, an armored truck driver for Loomis Fargo, was the victim of an armed robbery at the Albertson's Grocery Store on Barataria Boulevard in Marrero. A short while earlier, the store manager (Jarrod Guichard) and Bean had been in the vault room, where Guichard had given Bean a bag containing $15,000 in cash and $19,000 in checks and deposits. As Bean left the vault room, he saw a black male wearing red sweat pants, who appeared to be shopping for a movie in the store's videotape section. When Bean was approximately three feet away, the man turned, pulled a gun on Bean, and ordered him to put his hands in the air. The man took Bean's gun and the bag of money. He then ordered Bean to lie on the ground, and Bean complied. The man struck Bean in the head with a gun three times and ran out the store.
When Guichard came out of the vault room, he saw Bean on the floor in a daze. Guichard saw some customers pointing toward the exit and ran in that direction. He saw an individual, wearing a red jump suit and what appeared to be a woman's wig, enter a late-model black Lincoln Towncar with a temporary license tag in the back window. The vehicle headed southbound on Barataria Boulevard.
Deputy Christopher Gui of the Jefferson Parish's Sheriff's Office responded to the scene. After interviewing witnesses, Deputy Gui learned that the perpetrator had run out of the store with a black female. He obtained a description of the female, the perpetrator and the vehicle. Thereafter, he turned the investigation over to the responding detectives.
While in Lafitte on an unrelated call, Deputy Brent Coussou heard a broadcast over the police radio describing the suspect and the vehicle involved in the armed robbery. Deputy Coussou saw a Lincoln that matched the description of the suspect's vehicle near the E-Z Serve in Lafitte. Coussou stopped the vehicle, ordered the passenger (later identified as co-defendant Mary Uloho) to place her hands on the ceiling of the car, and ordered the driver to step out. Coussou, with the assistance of another officer, handcuffed the driver, later identified as the defendant. Coussou observed that the defendant was wearing grey coveralls over red sweat pants. The defendant was handcuffed and placed in another officer's unit. Deputy Coussou saw a wig, a red hat and a red sweatshirt in the car. Because Uloho was being cooperative and because he had experienced problems with his handcuffs, Deputy Coussou placed Uloho unhandcuffed in the rear seat of his police car. When a female officer arrived on the scene, Uloho was removed from the unit and handcuffed.
Meanwhile, Detective John Carroll brought Guichard to the scene, where he identified the Lincoln as the one that had fled from Albertson's. Thereafter, Detective Carroll removed the defendant from the police unit and stood next to him while Detective Decker drove by with Bean, who positively identified the defendant as the person who robbed and struck him. Bean also positively identified the defendant in court.
*901 Thereafter, Detective Carroll transported the defendant to the Detective Bureau, where the defendant made a statement after waving his constitutional rights. The defendant gave his name as "Pablo Moses" and stated that he had just met Mary Uloho. The defendant claimed that she had nothing to do with the earlier events and that he was pressured into doing what he did.
That same day, the Lincoln was towed to the Detective Bureau. Detective Decker obtained a search warrant for the Lincoln, which Decker learned had been rented by Uloho. The resulting search yielded a purse containing two handguns, one of which belonged to Bean. Another handgun was recovered from the front seat of the Lincoln. All three weapons were loaded. A red sweatshirt, a black wig, a red hat and a bag containing $19,000 in checks and deposits were also recovered from the Lincoln. The cash was later discovered in Deputy Coussou's car. It was later determined that Uloho had stuffed the bags of cash under the seats while she was unhandcuffed.
Approximately one month later, Detective Decker showed photographic lineups to three witnesses, who positively identified the defendant as the perpetrator. Two of these witnesses, Stanley Williams and Seneca Williams, testified about the robbery in Albertson's and testified they had made positive identifications of the robber after viewing a photographic lineup.

ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in failing to suppress the show up identification and the photographic identifications.
The defendant contends the trial court erred in denying his motion to suppress the identifications because they were suggestive and created a substantial likelihood of misidentification. Specifically, the defendant contends that the one-on-one identification by Terry Bean was suggestive because the defendant was the only black man in the vicinity and because he was handcuffed on the side of the road. The defendant contends the Williamses' identifications were suggestive because they saw a photograph of the defendant in the newspaper before viewing the photographic lineup. The State responds that the trial judge properly denied the motion to suppress because the defendant failed to meet his burden of proof.
A defendant challenging an identification procedure must prove that the identification was suggestive and that there was a substantial likelihood of misidentification. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Thibodeaux, supra.
Although one-on-one identifications are not favored, these identifications are permissible when justified by the overall circumstances. State v. Smith, 02-1018 (La.App. 5 Cir. 3/11/03), 844 So.2d 119, 123. This is particularly true when the one-on-one identification is closely associated in time with the commission of the crime and where the suspect is returned to the location of the crime for immediate identification. State v. Robinson, 404 So.2d 907, 909 (La.1981). Such identifications promote fairness by assuring reliability and the prompt release of innocent suspects. State v. Robinson, supra.
Fairness is the standard of review for identification procedures and reliability *902 is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 113-114, 97 S.Ct. 2243, 2252-53, 53 L.Ed.2d 140 (1977). The factors to be considered in assessing reliability include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson, 432 U.S. at 114, 97 S.Ct. at 2253. Any corrupting effect of a suggestive identification procedure is to be weighed against these factors. Id.
In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress but may also consider pertinent evidence given at the trial. State v. Higgins, 01-368, p. 5 (La.App. 5 Cir. 10/17/01), 800 So.2d 918, 921, writ denied, 01-3267 (La.11/1/02), 828 So.2d 565, cert. denied, 538 U.S. 1038, 123 S.Ct. 2082, 155 L.Ed.2d 1070 (2003).
We find the defendant did not meet his burden of proving the identifications were suggestive. Detective Decker testified at the suppression hearing that Bean identified the defendant within one hour of the robbery. While the defendant contends that he was the sole black man at the scene, nothing in the record indicates Detective Decker suggested that Bean should select the defendant as the suspect. Rather, Decker testified he asked Bean if he recognized anyone and Bean positively identified the defendant as the person who robbed him and struck him in the head with a gun. Further, although the defendant was in handcuffs, they were behind his back, not in front of his body.
Even if an identification procedure is suggestive, it is the likelihood of misidentification that violates due process, not the mere existence of suggestiveness. State v. Every, 96-185, pp. 10-11 (La.App. 5 Cir. 7/30/96), 678 So.2d 952, 957. Applying the factors in Manson v. Brathwaite, supra, it does not appear there was a substantial likelihood of misidentification. Bean's trial testimony indicates he had ample opportunity to view the defendant at Albertson's. Bean said he first noticed the defendant when he appeared to be shopping for a movie. Bean was just three feet away when the defendant turned, pulled a gun on him and told him to put his hands up. His prior description of the defendant was accurate.
At trial, Bean positively identified the clothing and the wig that the defendant wore at the time of the robbery. The time between the confrontation and the robbery was short, and Bean was very certain when he identified the defendant. In fact, Detective Decker testified at the suppression hearing that Bean said, "That's the subject right there. I'll never forget his face." Decker said Bean repeated this statement several times. Even if the one-on-one identification was suggestive, the defendant did not prove there was a substantial likelihood of misidentification.
Similarly, the defendant did not meet his burden regarding the photographic lineups shown to Stanley and Seneca Williams. While both the Williamses acknowledged at trial that they had seen the defendant's photograph in the newspaper sometime before seeing the photographic lineup on April 2, 2001, this Court has held that an identification procedure is not suggestive merely because a witness has previously seen a defendant's photograph. State v. Evans, 03-0752, p. 22 (La.App. 5 Cir. 12/9/03), 864 So.2d 682, *903 696, writ denied, 04-0080 (La.5/7/04), 872 So.2d 1079.
At the suppression hearing, Detective Decker testified that he showed the photographic lineup to the Williamses individually in separate rooms. The Williamses could not see each other viewing the lineup. As with Bean, there is nothing in the record that indicates the detective suggested that the Williamses should select any particular person. Rather, Decker testified he placed the lineup in front of each of them and asked if they could recognize anyone. Stanley Williams identified positively identified the defendant within fifteen to thirty seconds, and Seneca Williams identified the defendant almost immediately.
The defendant makes much of the discrepancies in the Williamses' description of the perpetrator. In particular, Stanley Williams acknowledged at trial that he described the robber as a black male wearing a dark or bluish sweat suit and a long wig, while Seneca Williams said she told Detective Decker that the robber was a black male wearing a long red wig, a red sweat shirt, and a cap that looked like a hood.[6] Seneca Williams acknowledged that she probably told Detective Decker that the man had a scarf over his head.
Although there are minor discrepancies in the Williamses' descriptions, the descriptions contain accurate details for the most part. The defendant was wearing red sweatpants when apprehended and a red cap, black wig and red sweat shirt were found in the car the defendant was driving. We do not find there was a substantial likelihood of misidentification. Both the Williamses had ample opportunity to view the defendant at the time of the robbery. The Williamses' testimony indicates they paid close attention during the robbery. Stanley Williams testified at trial that he first noticed the defendant because of his strange hair and clothing. He was near enough to hear what the robber said to Bean and saw the robber order Bean to the floor. Seneca Williams said she first took notice when the robber had Bean on the floor. Although Seneca Williams testified she was not wearing her glasses at the time, she stated she only needed her glasses for reading and could see without them. Both the Williamses saw the robber strike Bean in the head. According to the Williamses, the robber even pointed the gun them.
Both of them were certain in their identifications of the defendant. Seneca Williams testified it took her less than a minute to make her identification when Detective Decker showed her the lineup. Stanley Williams said he made his identification as soon as Decker put it in front of him. Further, the identifications took place a month after the robbery. Based on the foregoing, we find that the defendant did not meet his burden of proving that the identification procedure used with Stanley and Seneca Williams was suggestive, or that there was a substantial likelihood of misidentification.

ASSIGNMENT OF ERROR NUMBER TWO

The trial court erred in imposing an excessive sentence.
The defendant claims his mandatory life sentence as a third-felony offender is excessive because the trial court failed to give reasons for imposing the sentence and because the trial court did not consider any mitigating factors contained in the defendant's petition for leniency. The State responds that the defendant's sentence is not excessive.
*904 Before discussing excessiveness of sentence, we address a patent error noted by the defendant: specifically, that the trial court failed to rule on the defendant's oral motion to reconsider sentence. The defendant contends that the trial court's failure to rule on his oral motion for reconsideration requires a remand before this Court considers the excessiveness claim. The State responds that there are no errors patent, but notes in footnote two of its brief that the motion to reconsider remains open before the trial court.
After the life sentence was imposed, defense counsel made an oral motion for reconsideration of the sentence, but stated that he would follow up with a written motion. The trial court did not rule on the oral motion and the record does not reflect that a written motion was filed.
La.C.Cr.P. art. 881.4(C) provides that if it is "necessary to an appropriate disposition of a motion to reconsider sentence, the appellate court may remand the case to the trial court with instructions to supplement the record or to hold an evidentiary hearing." This Court has held that the failure of a trial court to rule on a timely motion for reconsideration of sentence requires a remand. State v. Evans, 02-1108, p. 5 (La.App. 5 Cir. 3/11/03), 844 So.2d 111, 113-114.
However, the defendant's oral motion for reconsideration of sentence did not state specific grounds for the motion, as required by La.C.Cr.P. art. 881.1(B). Defense counsel indicated he would file a written supplement to his oral motion, but failed to do so. We find that the defendant abandoned his motion by failing to file a written supplement, as he stated he would. The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Hester, 99-426, p. 10 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 103, writ denied, 99-3217 (La.4/20/00), 760 So.2d 342.
Accordingly, we find no merit to the defendant's suggestion his case should be remanded for a ruling on the motion to reconsider sentence, and we proceed to address the excessiveness of sentence issue.
The Louisiana Supreme Court has held a defendant should be sentenced pursuant to the version of La.R.S. 15:529.1 in effect at the time of the commission of the charged offense. State v. Parker, 03-0924, p. 16 (La.4/14/04), 871 So.2d 317, 326. On March 3, 2001, when the instant offense was committed, La.R.S. 15:529.1(A)(1)(b)(ii) provided:[7]
If the third felony or either of the two prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) or as a violation of the Uniform Controlled Dangerous Substances Law punishable by imprisonment for more than five years or any other crime punishable by imprisonment for more than twelve years, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
The trial court found that the defendant is a third-felony offender based on the charged offense of armed robbery plus predicate convictions of simple burglary of an inhabited dwelling in 1986 and armed robbery in 1989. Armed robbery is a crime of violence. La.R.S. 14:2(13). Accordingly, the defendant was subject to a *905 mandatory minimum habitual offender sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. The Louisiana Supreme Court has recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness. State v. Johnson, 97-1906, p. 6 (La.3/4/98), 709 So.2d 672, 676; State v. Dorthey, 623 So.2d 1276 (La.1993).
It is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional. State v. Johnson, 97-1906 at p. 6, 709 So.2d at 676. In order to rebut the presumption of constitutionality, the defendant must clearly and convincingly show that he is "exceptional, which ... means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case." State v. Johnson, 97-1906 at p. 8, 709 So.2d at 676.
When a trial court determines the minimum sentence mandated by La.R.S. 15:529.1 makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the trial judge must reduce the sentence to one that would not be constitutionally excessive. Dorthey, 623 So.2d at 1280. However, the Johnson court cautioned that a trial judge's determination that a mandatory minimum sentence is excessive requires more than merely uttering the above-quoted phrases. State v. Johnson, 97-1906 at p. 7, 709 So.2d at 676.
Further, the trial court cannot impose whatever sentence it may feel is appropriate. Rather, the court must impose the longest sentence that is not constitutionally excessive with specific reasons to explain why that sentence is the longest sentence that is not constitutionally excessive. State v. Johnson, 97-1906 at pp. 8-9, 709 So.2d at 677.
Finally, "[a] sentencing court should exercise its authority to declare excessive a minimum sentence mandated by the Habitual Offender Statute only under rare circumstances...." State v. Lindsey, 99-3256, p. 9 (La.10/17/00), 770 So.2d 339, 345 (emphasis as found in the original), cert. denied, 532 U.S. 1010, 121 S.Ct. 1739, 149 L.Ed.2d 663 (2001).
The record does not reflect that the defendant urged the trial court to deviate from the mandatory life sentence when he was sentenced on January 13, 2003.[8] Nor did the defendant urge the trial court to consider the petition for leniency on the date of his sentencing. Rather, the defendant urged the court to apply the five-year "cleansing period" that was in effect on *906 one of the predicate convictions.[9]
Based on the foregoing, we conclude the defendant failed to meet his burden of showing that he was exceptional to warrant a downward departure from the mandatory sentence. Hence, there is no basis for finding that the habitual offender sentence is excessive.
ASSIGNMENT OF ERROR NUMBER THREE
Error patent (No ruling on motion to reconsider sentence).
The motion to reconsider sentence is discussed under Assignment of Error Number Two, above.
We note there is an issue regarding the sufficiency of the evidence introduced at the habitual offender hearing. Specifically, the habitual offender bill of information discloses that more than ten years elapsed between the defendant's commission of the underlying offense in March 2001 and the second predicate conviction (armed robbery) on February 23, 1989. According to the multiple bill, the defendant was sentenced to ten years imprisonment at hard labor. The record does not contain the defendant's discharge date on that conviction, however.
The State bears the burden of proving that the predicate convictions fall within the "cleansing period." State v. Humphrey, 96-838, p. 13 (La.App. 5 Cir. 4/29/97), 694 So.2d 1082, 1088, writ denied, 97-1461 (La.11/7/97), 703 So.2d 35. This period begins to run from the date that the defendant is actually discharged from state custody and supervision. State v. Metoyer, 612 So.2d 755, 758 (La.App. 5 Cir.1992).
In this case, the applicable period is ten years. See, La.R.S. 15:529.1(C) as it existed at the time of the underlying offense in March 2001. Because the third and underlying felony was committed on March 3, 2001, more than twelve years after the 1989 conviction, the State was required to prove the discharge date on the 1989 conviction.
However, the defendant has not contested his habitual offender finding on appeal.
Recently, in State v. Hensley, 04-617 (La.App. 5 Cir. 3/1/05), 900 So.2d 1, this Court noted on its error patent review that there was a "potential issue" regard the sufficiency of the evidence at the multiple bill hearing in that the record did not reflect the underlying offense was committed within ten years of the discharge date of the next predicate conviction.[10] Although Hensley asserted that his life sentence as multiple offender was excessive, he did not contest his habitual offender finding on appeal. In Hensley we noted, "[W]hether a trial court complied with La. C.Cr.P. art. 556.1 in a guilty plea colloquy is not subject to error patent review, but must instead be designated as an assignment of error by the defendant on appeal," citing State v. Guzman, 99-1753, p. 6 (La. 5/16/00),16 769 So.2d 1158, 1162. Based on that, we found that no corrective action was required because the defendant had not complained of the error. Hensley, 04-617, 900 So.2d at 14.
*907 Accordingly, in this case we follow Hensley and take no action because the defendant has not raised the issue.
We note, finally, that there a discrepancy between the minutes and the transcript that requires correction. The transcript for April 3, 2002 reflects that on the second day of trial, the defendant made an oral motion under La.C.Cr.P. art. 706 to try his two cases together.[11] The trial judge granted the motion and made it retroactive to the beginning of trial. The minute entry, however, does not so reflect. We remand the matter to allow the trial judge to correct the minute entry to conform with the transcript.
For the foregoing reasons, we confirm the defendant's convictions and sentences. We remand the case and instruct the trial court to correct the minute entry of April 3, 2002 to reflect that the trial court granted the defendant's oral motion to try the two cases together.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF PATENT ERROR.
NOTES
[1] Neither appellate record contains any motions to suppress. However, it is clear from the transcript that the State, the court, and defendant were under the impression that motions to suppress were filed and set for a hearing that day regarding both cases.
[2] The State subsequently nolle prosequied this charge and charged Uloho in a new bill of information with obstruction of justice. Uloho was found guilty as charged and her conviction was affirmed in State v. Uloho, 04-55 (La.App. 5 Cir. 5/26/04), 875 So.2d 918, 921, writ denied, 04-1640 (La.11/19/04), 888 So.2d 192.
[3] On the second day of trial, the defendant made an oral motion under La.C.Cr.P. art. 706 to try the charges together. The trial judge granted the motion and made it retroactive to the beginning of trial. The minute entry, however, does not so reflect.
[4] The trial judge subsequently recused himself because he learned that defendant was related to one of his personal friends.
[5] On May 21, 2003, the defendant filed a pro se motion requesting an out-of-time appeal and his trial transcripts, which the trial court denied. On September 9, 2003, the defendant's retained attorney filed a motion to withdraw from district court case number 01-1922 (appeal number 04-1342) and to have the Louisiana Appellate Project appointed to represent the defendant in his appeal. The trial court granted this motion and notices of appeal were generated for this case number.

On February 3, 2004, the defendant's retained counsel filed a motion for an out-of-time appeal in district court case number 01-1657, which the trial court denied on February 17, 2004 because it was not an application for post-conviction relief. On March 23, 2004, retained counsel filed an application for post-conviction relief seeking reinstatement of the defendant's appeal rights in this case, which the trial court granted. In the meantime, the appeal for district court case number 01-1922 (which is now 04-1342), was lodged in this court. The appeal, (which was then 04-56), was ultimately dismissed without prejudice and remanded for consolidation with district court case number 01-1657.
[6] The Williamses were not subpoenaed to testify at the suppression hearing.
[7] This provision was subsequently amended by Acts 2001, No. 403, § 2, effective June 15, 2001.
[8] At the habitual offender hearing on July 25, 2002, Judge Melvin C. Zeno found the defendant to be a third felony offender. The defendant presented the trial judge with a petition for leniency that he urged the trial judge to consider. He also urged the trial judge to deviate from the mandatory life sentence because one of the predicates was not a violent offense. The trial judge stated that he would consider the matter further and reset the matter for sentencing. However, Judge Zeno later recused himself because he recognized a name in the petition for leniency. The defendant was ultimately sentenced by Judge Ross P. LaDart on January 13, 2003.
[9] The Louisiana Supreme Court has recognized that the applicable period is the one in effect when the underlying offense is committed in State v. Everett, 00-2998 (La.5/14/02), 816 So.2d 1272. Additionally, the Everett court stated: "[W]e will refrain from using the term ["cleansing period"] in this analysis and invite other courts and counsel to do the same in the future." 00-2998 at p. 7, 816 So.2d at 1276.
[10] A writ application to the Louisiana Supreme Court was filed on March 30, 2005.
[11] La.C.Cr.P. art. 706 provides as follows:

Upon motion of a defendant, or of all defendants if there are more than one, the court may order two or more indictments consolidated for trial if the offenses and the defendants, if there are more than one, could have been joined in a single indictment. The procedure thereafter shall be the same as if the prosecution were under a single indictment.